14 CV 2907

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
SALLY FERREIRA,

                     Plaintiff,

-against-

CURTIS J. JACKSON, III, p/k/a "50 CENT,"

                     Defendant.
---------------------------------------------------------------x

Civil Action No.:

COMPLAINT

Trial By Jury Demanded

JUDGE KARAS

RECEIVED APR 24 2014 U.S.D.C. S.D.N.Y.

    Plaintiff Sally Ferreira, by her attorneys, Caplan & Ross, LLP, as and for her Complaint against Defendant Curtis J. Jackson, III, p/k/a "50 Cent," alleges as follows:

## JURISDICTION AND VENUE

    1.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a) in that there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

    2.    Venue lies in the district pursuant to 28 U.S.C. §1391(a) in that a substantial part of the events giving rise to the claims herein occurred in the Southern District of New York, and at the time of commencing this action, Defendant is subject to personal jurisdiction in the Southern District of New York.

## THE PARTIES

    3.    Plaintiff Sally Ferreira ("Ferreira") is an individual who is a resident and citizen of Westchester County, New York, living in Yonkers.

    4.    Upon information and belief, Defendant Curtis J. Jackson, III, p/k/a "50 Cent" ("Jackson") is an individual who is a resident and citizen of the State of Connecticut.

## BACKGROUND

5. Ms. Ferreira is a model, actress and dancer/performer, who has worked in television, motion pictures, music videos, promotion and, commercial advertising campaigns.

6. Over the years, Ms. Ferreira has appeared in several music videos, including, but not limited to, two music videos with Mr. Jackson for the songs "OK, You're Right" and "I Like The Way She Do It," the music video for "Monster" by Kanye West featuring Jay Z, Nicki Minaj, Rick Ross and Bon Iver, the music video for "Let It Go" by Keyshia Cole featuring Missy Elliot and Lil' Kim, the music video for "War Zone" by The Wanted, the music video for "Lejos" by Toby Love, and many others.

7. Mr. Jackson, professionally known as "50 Cent," is a rapper, hip hop music star, and business entrepreneur.

8. Mr. Jackson has had a prolific music career to date, putting out four studio albums, with several hit singles at the top of the charts, and his fifth studio album, "Animal Ambition," is slated to be released in June of this year.

9. Mr. Jackson has also entered into several business ventures and/or endorsement deals with music and non-music related entities, such as Vitamin Water, and most recently founded SMS Audio, selling headphones with the name "Street by 50."

10. Mr. Jackson has an active social media presence on both Twitter and Instagram with millions of followers on each.

11. Ms. Ferreira has known and worked with Mr. Jackson for many years, appearing in several of his previous music videos. On numerous occasions during the filming of these videos with Mr. Jackson, photographs of Ms. Ferreira and Mr. Jackson standing together were taken.

12. On or about March 23, 2014, Ms. Ferreira was asked by Suzana Halili (a makeup artist) to consider appearing in Mr. Jackson's music video for the song entitled "Big Rich Town" featuring Joe and directed by Elf Rivera (the "Big Rich Town Video"), and was subsequently asked by Mr. Rivera to participate in the shoot.

13. The Big Rich Town Video, shot on March 23, 2014, was filmed, without permits, on the public 4 train line in the Bronx.

14. Ms. Ferreira does not possess and never possessed a copy of the Big Rich Town Video, or any of its elements.

15. Ms. Ferreira likewise does not possess and never possessed any photographs of the video shoot.

16. Shortly after the Big Rich Town Video shoot, photographic images of Ms. Ferreira and Mr. Jackson taken by third parties during the day of the public video shoot appeared on Hip Hop Weekly and MediaTakeOut.com, respectively, on or about March 25 and 26, 2014. A copy of the MediaTakeOut.com webpage is annexed hereto as Exhibit A and incorporated by reference herein.

17. On March 27, 2014, without undertaking any investigation whatsoever, Mr. Jackson falsely accused Ms. Ferreira of being the source of the MediaTakeOut.com coverage by posting a picture of Ms. Ferreira on his personal Instagram account with the following text superimposed over her image: "WARNING: Do not attempt to work with this thirsty Video bitch [Her name is Sally Ferreira and she's a model...] she sent photos Of the video shoot to Mediatakeout Saying I'm in a relationship With her Can anyone say RESHOOT."

18. Below the picture, Mr. Jackson captioned the post as follows: "Big FAIL, super thirsty, new shoot this week coming. Unbelievable #smsaudio #Animal Ambition."

19. A true and correct copy of Jackson's Instagram posting (the "Defamatory Posting") is annexed hereto as Exhibit B and incorporated by reference herein.

20. The factual statements contained in the Defamatory Posting are false.

21. Ms. Ferreira never: (i) sent photos of the video shoot to MediaTakeOut.com; or (ii) said Mr. Jackson was in a relationship with her.

22. Ms. Ferreira has been in a committed relationship with her fiancé for over 9 years, and Mr. Jackson, at all relevant times, has known of this relationship.

23. Mr. Jackson had no factual basis upon which to predicate his assertion that people should "not attempt to work" with Ms. Ferreira.

24. To the extent the Defamatory Posting is deemed to contain opinion, that opinion is actionable as a "defamatory opinion" since the facts upon which it is predicated are false.

25. The defamatory statements contained in the Defamatory Posting were made with the intent to, and did, injure Ms. Ferreira in her business, trade and/or profession, effectively labeling her as untrustworthy and seeking to blacklist her from being hired on future projects in the entertainment industry.

26. The defamatory statements have subjected, and continue to subject, Ms. Ferreira to ridicule and scorn.

27. Upon information and belief, Mr. Jackson knew his posting would be widely circulated and published to hundreds of thousands, if not millions, of individuals and entities.

28. Indeed, Mr. Jackson has in the past used his social media accounts, particularly Twitter and Instagram, to influence his followers and promote his activities and products, and knows from experience that many people and numerous media outlets follow his social media postings.

4

29. For example, Mr. Jackson knew that in the past he promoted a stock on his Twitter account, which stock substantially increased in value following his promotion.

30. In fact, the Defamatory Posting was widely disseminated and published.

31. Mr. Jackson's personal Instagram account has over 1.8 million followers.

32. Upon information and belief, Mr. Jackson's Instagram account is linked to his personal Twitter account (i.e., his Twitter followers receive notice of Jackson's Instagram postings) which has over 7 million followers.

33. Indeed, as shown in Exhibit B, only 40 minutes after putting up the Defamatory Posting, it had already received 6156 likes and over 850 comments.

34. Upon information and belief, Mr. Jackson knew at all relevant times that numerous media outlets regularly follow and check his social media updates on Instagram and Twitter.

35. Upon information and belief, such media outlets include, but are not limited to, MediaTakeOut.com, Urban Belle Mag, VladTV, and DJ Funkmaster Flex's website, inflexwetrust.com.

36. A few hours after publishing the Defamatory Posting, Mr. Jackson and/or his representatives removed the posting, in recognition of his wrongdoing.

37. The removal of the Defamatory Posting did not end its publication, as screen shots of the Defamatory Posting were captured by several media outlets that were following Mr. Jackson's Instagram and/or Twitter accounts, and the posting was republished and distributed via numerous media entities, including, but not limited to MediaTakeOut.com, MStarz, Urban Belle Mag, Promopalaceblog.com, Celebnmusic247.com, VladTV, and DJ Funkmaster Flex. Copies

5

of the various articles, and hurtful comments following, are annexed hereto as collective Exhibit C and incorporated by reference herein.

38. As an example, DJ Funkmaster Flex posted several articles on his website, inflexwetrust, and hot97.com regarding the Defamatory Posting and confirming that Mr. Jackson effectively sought to blacklist Ms. Ferreira from working as a "video girl" ever again. The first of Funkmaster Flex's articles, entitled "50 Cent Exposes A 'Video B***h' For Lying About Their Relationship," dated March 26, 2014, expressly acknowledges that Jackson "is making sure that [Ms. Ferreira] doesn't work in this town again." A subsequent article on hot97.com, dated March 27, 2014 is titled "Fraud Alert: 50 Cent Blasts Video Girl For Lies and Dehydration on Twitter." See Exhibit C.

39. Upon information and belief, this is precisely the harm Mr. Jackson intended to cause Ms. Ferreira when he published the Defamatory Posting.

40. Upon information and belief, thousands of people who have seen the various articles have made negative and hurtful comments about Ms. Ferreira, as a direct result of Mr. Jackson's action.

41. Before the Defamatory Posting, Ms. Ferreira was working on three separate entertainment industry projects and enjoyed a good reputation in the industry.

42. As a direct and proximate result of the Defamatory Posting and the subsequent media fallout and negative publicity surrounding Ms. Ferreira, as of the date of this filing, all three projects have been put indefinitely on hold.

43. Moreover, as a direct and proximate result of Mr. Jackson's actions, Ms. Ferreira has been subjected to harsh and hurtful comments about her profession, character, and appearance, causing her severe emotional distress.

44. In addition to wrongfully disparaging Ms. Ferreira in her chosen profession, calling her a "thirsty video bitch," improperly blaming Ms. Ferreira for the posting of the photographs on MediaTakeOut.com, and inciting the wrath of thousands (if not millions) of strangers and industry insiders alike against Ms. Ferreira, Mr. Jackson also used the Defamatory Posting as a marketing opportunity to promote two of his own commercial projects – his upcoming album, "Animal Ambition," and his headphone line through "SMS Audio" – unlawfully using Ms. Ferreira's name and image in the process.

45. Mr. Jackson, knowing that his millions of social media followers would see the Defamatory Posting, and knowing that various media outlets would pick up on the Defamatory Posting, included hashtags to promote his upcoming album, "#AnimalAmbition," and his headphone company, "#smsaudio."

46. A hashtag is a word or phrase preceded by a hash or pound sign (#) and can be used to identify messages on a specific topic and group such messages that contain it to enable a user to search for all images or messages with that particular hashtag.

47. Hashtags are routinely used to advertise and promote product lines.

48. Mr. Jackson's shameless promotion of his two projects is apparent from the complete irrelevance of the hashtags used in the context of the posting about Ms. Ferreira.

49. At no time did Mr. Jackson obtain Ms. Ferreira's written consent to use her name or picture in connection with his advertising for his upcoming album and headphone line.

50. Jackson has a history of disrespecting and demeaning women.

51. Jackson has a history of employing bullying tactics.

## AS AND FOR A FIRST CLAIM
(Defamation)

52. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 above as if fully set forth herein at length.

53. The Defamatory Posting contained false statements of fact subject to a defamatory meaning.

54. Defendant Jackson acted with knowledge of the falsity of the statements contained in the Defamatory Posting, with reckless disregard for the truth and/or with malicious intent, in publishing the false statements to third parties.

55. The Defamatory Posting is libelous *per se* in that it defames and otherwise impugns Plaintiff's integrity and reputation in her profession.

56. As specified in more detail herein, Plaintiff was injured by the publishing of the Defamatory Posting and false statements.

57. By reason of the foregoing, Defendant has willfully, recklessly, intentionally and maliciously defamed Plaintiff.

58. Defendant is liable to Plaintiff for the damages Ferreira has incurred.

59. As a result, Plaintiff has been damaged in an amount to be determined at trial, but which is not less than Five Million Dollars ($5,000,000.00).

60. By reason of Defendant's intentional and malicious defamation of Plaintiff, Plaintiff is also entitled to punitive damages.

## AS AND FOR A SECOND CLAIM
(Intentional Infliction of Emotional Distress)

61. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 58 above as if fully set forth herein at length.

62. In publishing the Defamatory Posting on Instagram disparaging and demeaning Plaintiff, Defendant engaged in conduct towards Plaintiff that was so extreme and outrageous so as to exceed the bounds of decency in a civilized society.

63. By his actions and conduct, Defendant intended to and did intentionally cause, or acted with reckless disregard of the substantial probability of causing, Plaintiff to suffer severe emotional distress.

64. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, severe emotional distress, for which she is entitled to an award of damages to be determined at trial, but in no event less than Five Million Dollars ($5,000,000.00).

65. Defendant's extreme and outrageous conduct was knowing, malicious, willful and wanton, entitling Plaintiff to an award of punitive damages.

## AS AND FOR A THIRD CLAIM
(Violation of Sections 50 and 51 of the New York Civil Rights Law)

66. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 63 above as if fully set forth herein at length.

67. Defendant, by making the Defamatory Posting, knowingly used Plaintiff's name and picture for the commercial purpose of marketing, advertising, selling and/or soliciting the purchase of goods and products, namely his upcoming album and headphones.

68. Such use was wholly unauthorized and was without the consent, written or oral, of Plaintiff or anyone authorized by her to give such consent.

69. Upon information and belief, all or a substantial portion of the preparation, publication, and distribution of the Defamatory Posting with advertisements occurred within this state.

70. Defendant acted knowingly, willfully and in bad faith.

71.     By reason of the foregoing, and pursuant to Sections 50 and 51 of the New York Civil Rights Law, Plaintiff demands an injunction enjoining Defendant from using Plaintiff's name and likeness in connection with any other advertisement or promotion for his products.

72.     Moreover, by reason of the foregoing and pursuant to Sections 50 and 51 of the New York Civil Rights law, Defendant is liable to Plaintiff for compensatory damages in an amount to be determined at trial, but in no event less than One Million Dollars ($1,000,000.00), and punitive damages.

**WHEREFORE**, Plaintiff demands judgment as follows:

(a)     On the First Claim for Defamation, an award of damages to Plaintiff in an amount to be determined at trial, but not less than Five Million Dollars ($5,000,000.00) and punitive damages;

(b)     On the Second Claim for Intentional Infliction of Emotional Distress, an award of damages to Plaintiff in an amount to be determined at trial, but not less than Five Million Dollars ($5,000,000.00) and punitive damages;

(c)     On the Third Claim pursuant to Sections 50 and 51 of the New York Civil Rights Law, (i) an injunction enjoining Defendant from using Plaintiff's name and likeness in connection with any other advertisement or promotion for his products, and (ii) an award of damages to Plaintiff in an amount to be determined at trial, but not less than One Million Dollars ($1,000,000.00), plus punitive damages;

(d)     An award to Plaintiff of the costs and disbursements incurred in this action; and

(e)     Such other and further relief as the Court deems just and proper.

Dated: April 24, 2014
       New York, New York

                                           CAPLAN & ROSS, LLP

                                           By: _____
                                                Brian D. Caplan (BC-1713)
                                          270 Madison Avenue, 13th Floor
                                          New York, New York 10016
                                          (212) 973-2376
                                          Attorneys for Plaintiff